UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SNAKE RIVER WATERKEEPER, | Case No. 1:21-cv-00269-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| IDAHO POWER COMPANY, | |
| Defendant(s). | |

## INTRODUCTION

Plaintiff, Snake River Waterkeeper (SRW), brought this citizen suit action under the Clean Water Act (CWA), alleging that defendant, Idaho Power Company, has violated the CWA by making unpermitted discharges of pollutants into the Snake River from "Unit 5" of the Brownlee Dam. Currently pending before the Court is a motion filed by Idaho Power seeking to stay this case until the Idaho Department of Environmental Quality (IDEQ) has issued a National Pollutant Discharge Elimination System (NPDES) permit to cover the discharges from Unit 5. (Dkt. 24.) For the reasons discussed below, the Court denies the motion.

# BACKGROUND[1]

The Snake River is severely degraded due to pollution and rising water temperatures. Brownlee Dam is located on the Snake River and is owned and operated by Idaho Power. The Dam discharges pollutants, including oils, greases, other lubricants, and cooling water and heat, into the Snake River. These pollutants have contributed to the pollution crisis on the Snake River.

EPA issued Idaho Power an NPDES permit for the Dam in 1974. At the time the 1974 permit was issued, the Dam consisted of a single powerhouse (Powerhouse 1) with four generating units (Units 1-4) and five total outfalls. The 1974 Permit authorized discharges from the five outfalls from Units 1-4 as well as sanitary sewage outfall.

During the period 1976 to 1980, Idaho Power constructed a second powerhouse—Powerhouse 2—at the Dam, and an additional generating unit—Unit 5—which is housed in Powerhouse 2. The Unit 5 generator is larger than Units 1-4 and has at least two new outfalls that are not covered by the 1974 NPDES permit.

In February 1980, Idaho Power submitted an application to EPA for a new or amended NPDES permit to authorize discharges from Unit 5. Idaho Power also

---

[1] For purposes of the motion to stay, the Court will take as true the allegations in the complaint (Dkt. 1).

informed EPA that it would begin testing Unit 5 in March 1980 and that it planned to begin operating the unit shortly thereafter. EPA did not act on Idaho Power's 1980 application or otherwise authorize discharges from Unit 5. In 2003, Idaho Power submitted a new NPDES permit application to EPA requesting permit coverage for all discharges at the Dam (e.g., to cover Units 1-4 as well as Unit 5). EPA never approved or denied that application.

In 2018, EPA promulgated a draft NPDES general permit for pollutant discharges from hydroelectric facilities in Idaho. This draft NPDES permit was intended to address the types of discharges associated with the Dam and that are the subject of this action. Rather than encouraging EPA to engage in this process that would finally address and authorize the discharges from Unit 5, Idaho Power submitted comments urging EPA to halt these efforts. These comments noted that the State of Idaho was seeking NPDES permitting authority and expressed Idaho Power's preference that Idaho draft the NPDES permit rather than EPA. In June 2018, EPA approved Idaho's application to allow it to administer and enforce the federal NPDES permitting program.

In April 2021, Idaho Power submitted an application to Idaho Department of Environmental Quality (IDEQ) for an NPDES permit that would cover discharges from Unit 5, as well as those from Units 1-4. Idaho Power and IDEQ are

attempting to expedite this process, including through Idaho Power's agreement to reimburse IDEQ for the hiring of an independent contractor to process Idaho Power's NPDES permit application. IDEQ expects to complete the development of a draft NPDES permit by November 2022.

To date, no NPDES permit for discharges from Unit 5 has been issued. Thus, since 1980, Idaho Power has been operating Unit 5, and has been discharging pollutants into the Snake River from that operation, without an NPDES permit authorizing those discharges.

SRW filed the present action seeking a declaratory judgment that Idaho Power has violated the CWA by discharging pollutants associated with Unit 5 into the Snake River without the authorization of an NPDES permit. SRW also seeks to enjoin Idaho Power from discharging such pollutants into the Snake River until those discharges are authorized by an NPDES permit, and the imposition of civil penalties for Idaho Power's CWA violations.

Idaho Power seeks to stay the proceedings, contending that "it would be prudent to wait until the permit issues before proceeding any further in this matter, to afford IDEQ the opportunity to determine how best to regulate Unit 5 in the first instance." (Dkt. 24-1 at 2-3

## LEGAL STANDARD

A district court "has broad discretion to stay proceedings as an incident to its

power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997); *see Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."). In exercising its discretion, the district court should consider whether staying the case serves judicial economy and efficiency, and any potential prejudice to the parties if the case is or is not stayed. *See CMAX, Inc. v. Hall, 300 F.2d 265, 268* (9th Cir. 1962) (in determining whether to grant a stay or proceedings, the court should consider the competing interests, including "the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay"); *Tuttle v. Treasure Valley Marine, Inc.*, No. 1:15-CV-00314-BLW, 2017 WL 822798, at *1 (D. Idaho Mar. 2, 2017); 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1360, at 438–39, 441 (2d ed.1990).

## CLEAN WATER ACT CITIZEN SUIT PROVISION

Section 301 of the CWA makes it unlawful for any person to discharge any pollutant into waters of the United States without authorization, such as a NPDES permit. 33 U.S.C. § 311. Private citizens may bring actions to enforce the CWA,

including the failure to comply with NPDES permit requirements. *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1012 (9th Cir. 2002).

"The CWA imposes strict civil liability on violators of its provisions. The defendant's good faith or reference to data reporting errors is irrelevant to establishing civil liability." *Oregon State Pub. Int. Rsch. Grp., Inc. v. Pac. Coast Seafoods Co*., 361 F. Supp. 2d 1232, 1240 (D. Or. 2005 (citations omitted); *see Save Our Bays & Beaches v. City & Cty. of Honolulu*, 904 F. Supp. 1098, 1105 (D. Haw. 1994) (noting that the CWA imposes strict liability for violations of NPDES permits and "the permit holder's good faith is not relevant to the issue of liability"); *Hawaii's Thousand Friends v. City and County of Honolulu*, 821 F. Supp. 1368, 1392 (D. Haw.1993) ("The fact that a violator is 'without fault' in committing violations of the Clean Water Act does not absolve the violator from penalties, although it may mitigate the amount of the penalties assessed.").

Relief available for violation of the CWA includes civil penalties imposed per violation per day, injunctive relief, and recovery of litigation expenses. 33 U.S.C. § 1319(d); 33 U.S.C. § 1365(a), (d); 40 C.F.R. § 19.4. When determining the amount of a civil penalty to impose, "the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the

violation, any history of such violations, any good-faith efforts to comply with the
applicable requirements, the economic impact of the penalty on the violator, and
such other matters as justice may require." 33 U.S.C.A. § 1319(d).

## ANALYSIS

Idaho Power does not dispute that there have been discharges from Unit 5
since operations began in 1980; that a NPDES permit is required for those
discharges; and that Idaho Power does not have an NPDES permit to cover those
discharges. Nonetheless, Idaho Power contends that a stay is appropriate in this
case because it is necessary to (a) ensure an efficient and cost-effective resolution
of this proceeding, (b) prevent harm to Idaho Power, and (c) ensure IDEQ's
regulatory role is not thwarted.

### A.    Efficient and Cost-Effective Resolution

Idaho Power contends that due to its proactive compliance efforts, the
absence of an NPDES permit for Unit 5 "amounts to a paperwork violation caused
by the federal government" and that Idaho Power and IDEQ are working to remedy
this violation "as expeditiously as possible." However, the CWA imposes strict
liability on violators. Thus, Idaho Power's intent is not relevant to establishing
civil liability under the CWA. *See Oregon State Pub. Int. Rsch. Grp., Inc.*, 361 F.
Supp. 2d at 1240.

Idaho Power further contends that a short stay will address all the issues

raised in this case and allow IDEQ to make determinations that go directly to the resolution of the case, including limits, requirements, and conditions that apply to Unit 5. Thus, Idaho Power argues that a stay will simplify the issues in this case. The Court disagrees.

This action does not challenge the specific requirements that should be included in any NPDES permit that may ultimately be issued by IDEQ. Instead, this action challenges Idaho Power's discharging of pollutants from Unit 5 for over 40 years without an NPDES permit covering those discharges,[2] and the appropriate remedy for those continuing *unpermitted* discharges. "The Court is empowered and competent to resolve that question and to craft an equitable remedy if appropriate" and does not require input from IDEQ to do so. C*tr. For Env'tl Law & Policy v. U.S. Fish and Wildlife Svs.*, 2017 WL 1731706, *5 (E.D. Wash. 2017); *see Conservation Law Foundation v. Exxon Mobil Corp*, 3 F.4th 61 (9th Cir. 2021) (vacating district court's order staying case until EPA issued new permit, noting that "[w]hether and on what terms EPA issues the permit . . . seems to us largely irrelevant to whether ExxonMobil has violated the conditions of the permit currently in effect").

------------------------------------------------------

[2] . The Court declines Idaho Power's invitation to assume that these unpermitted discharges that have continued for more than 40 years have not caused environmental damage.

Further, in determining any penalty to be imposed, the Court will need to examine factors such as the seriousness of the violations; the economic benefit, if any, resulting from the violations; the history of violations; any good faith efforts to comply with applicable requirements; the economic impact of the penalty on the violator; and other matters as justice requires. *See* 33 U.S.C. § 1319(d). These issues will not be addressed by IDEQ in processing Idaho Power's permit application.

Idaho Power's reliance on *Olympic Forest Coalition v. Coast Seafoods Co.*, 2019 WL 2602543 (W.D. Wash. 2019) is misplaced. In that case, the defendant had been informed by the state agency in charge of issuing NPDES permits that a permit was not required for the defendant's discharges. *Id.* at *1. However, the district court disagreed with the agency and determined that an NPDES permit was required for the defendant's discharges. *Id.* After the Ninth Circuit affirmed this determination, the defendant applied to the agency for an NPDES permit. *Id.* The district court found that the state agency's input on the severity of the pollution caused by the unpermitted discharges and the measures needed to alleviate that pollution, "will necessarily" involve significant input from the state agency. *Id.* Thus, the district court deemed it "too early to determine the severity of the un-permitted discharges," and declined to determine the appropriate penalty until after

the state agency's review of the permit application was completed. *Id.*

In contrast to the situation in *Olympic Forest*, here it is undisputed that Idaho Power has known since 1980 that an NPDES permit was required for its operation of Unit 5. Thus, this is not a situation where a defendant has been told by the agency that it does not need an NPDES permit, and then is later informed by a court that it does. Further, to the extent *Olympic Forest* indicates, and that Idaho Power suggests, a blanket approach that would stay a case any time unpermitted discharges are involved so that the applicable agency can determine in the first instance the severity of those discharges, the Court rejects such an approach. Instead, the Court finds that a case-by-case approach is appropriate.

After examining the circumstances at issue in the present case, the Court does not find this case to be one in which a stay should be issued.

**B.   Harm if Stay is not Issued**

Idaho Power contends it will be harmed if  a stay is not issued. Specifically, Idaho Power contends it could be harmed if the Court imposes interim discharge requirements that are inconsistent with those ultimately imposed upon IDEQ's issuance of a NPDES permit. Interim discharge requirements are not, however, currently at issue in the case. If, in the future, the question of interim discharge requirements is presented to the Court, Idaho Power can raise the risk of potential inconsistencies at that time.

Idaho Power also contends that it will be harmed if forced to defend this action while the NPDES permit is being processed by IDEQ because it will distract Idaho Power from that permitting process and require Idaho Power to proceed with discovery and trial preparation. The Court does not find  the distraction of defending this lawsuit, including engaging in discovery and trial preparation, to be "harm" that would justify a stay.

### C.    Impact on IDEQ's Regulatory Role

Idaho Power argues that a stay is necessary to ensure that IDEQ's regulatory role is not thwarted and to allow IDEQ "to craft an appropriate permit without external interference from any future requests for injunctive relief, which Plaintiff has threatened in this case." (Dkt 24-1 at 16.) However, IDEQ is not a party to this action and there is no request for injunctive relief against IDEQ. Further, as noted above, this action challenges Idaho Power's ongoing *unpermitted* discharges. It does not involve, or in any way challenge, IDEQ's review of Idaho Power's application for an NPDES permit. Accordingly, proceeding with this action will not risk creating "external interference" with IDEQ's regulatory process.

## ORDER

IT IS ORDERED that Defendant's Motion to Stay (Dkt. 24) is DENIED.

DATED: February 26, 2022

B. Lynn Winmill
U.S. District Court Judge